

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **STERLING McGRUDER,** | ) | |
| | ) | |
| Plaintiff, | ) | **No. 07 C 3127** |
| | ) | |
| v. | ) | |
| | ) | **Magistrate Judge Maria Valdez** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This is an action brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying plaintiff Sterling McGruder's claim for Supplemental Security Income Benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, McGruder's motion for summary judgment [Doc. No. 18] is granted in part and denied in part, and the Commissioner's motion for summary judgment [Doc. No. 21] is denied. The Court finds that this matter should be remanded to the Commissioner for further proceedings.

## BACKGROUND

### I.    PROCEDURAL HISTORY

McGruder originally applied for Supplemental Security Income Benefits ("SSIB") on January 7, 2004, alleging disability since December 12, 1991. (R. 80.) The application was denied on April 12, 2004 and upon reconsideration on August 27, 2004. (R. 33, 39.) McGruder filed a timely request for a hearing by an Administrative Law Judge ("ALJ"), which was held on

October 28, 2005. (R. 22.) McGruder personally appeared and testified at the hearing and was

represented by counsel. (*Id.*) A medical expert, a vocational expert, and McGruder's sister also

testified at the hearing. (*Id.*)

On June 28, 2006, the ALJ denied McGruder's claim for benefits and found him not

disabled under the Social Security Act. (R. 30.) The Social Security Administration Appeals

Council denied McGruder's request for review on June 28, 2006, (R. 4), leaving the ALJ's

decision as the final decision of the Commissioner and therefore reviewable by the District Court

under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II.   FACTUAL BACKGROUND

### A.   Background

McGruder was born on February 24, 1962.[1] (R. 29, 31-32.) At the time of the ALJ

hearing he was forty-three years old. (*Id.*) He is five feet eight inches tall and weighs 165

pounds. (R. 158.) He attended school through the eighth grade and has never been traditionally

employed.[2] (R. 158, 162.)

McGruder claims disability beginning December 21, 1991,[3] because of organic mental

and learning disorders. (R. 154.) McGruder at one time had received SSIB; however, due to an

incarceration,[4] he became ineligible to receive benefits and was required to reapply. (*Id.*)

---

[1]  McGruder testified that he was born on February 12, 1962, (R. 158), but all relevant documents in the
record reflect a birth date of February 24, 1962. McGruder was not asked about the discrepancy, and
there is no explanation in the record.

[2]  McGruder had a job sweeping the kitchen floor while he was incarcerated. (R. 162.)

[3]  Though McGruder claims disability beginning December 21, 1991, in accordance with 20 CFR §
404.468, this opinion only considers evidence of disability starting January 7, 2004.

[4]  20 CFR § 404.468 provides that no monthly benefits will be paid to any individual for any month any
part of which the individual is confined in a jail, prison, or other penal institution or correctional facility

2

McGruder reapplied for benefits on January 7, 2004. (*Id.*) This decision is limited to McGruder's reapplication.

### B. Testimony and Medical Evidence

#### 1. McGruder's Testimony

McGruder testified that he does not have his own apartment and has lived with one of his sisters since being released from prison. (R. 164.) He also testified that he has never had a job, (R. 162), and was placed in special education classes while in elementary school. (R. 158.) In response to the ALJ's inquiry regarding how far he went in school, McGruder responded: "About seventh grade, sixth, seventh or eighth." (*Id.*) McGruder testified that he cannot read, has never had a driver's license, and is only capable of simple math. (R. 161.) McGruder further testified that his sister pays the bills and provides him with food and clothing. (R. 163.)

McGruder sleeps on the couch at his sister's house and spends most of the day sleeping and watching television, though it is not clear how much he understands. (R. 165.) McGruder testified that he rarely leaves the house, and when he does it is generally just to the corner store and back. (R. 167.) McGruder stated that he does not cook and only eats when food is prepared for him. (R. 166.) McGruder testified that he can take care of his own personal needs such as bathing and cleaning his teeth, in addition to helping out around the house with tasks such as cleaning, raking leaves, taking out the garbage, and doing laundry. (R. 166, 168.)

McGruder testified that while he was in prison, his days were structured, and he was frequently in the hold for arguing with the authorities. (R. 200-01.)

#### 2. Dianna McGruder-Greene's Testimony

Dianna McGruder-Greene ("Greene"), Sterling McGruder's sister, testified that she is a

_____

for conviction of a felony.

registered nurse practicing in two Cook County hospitals and is an active United States Army reservist. (R. 171.) She has had an opportunity to observe McGruder throughout his life. (*Id.*) Greene stated that McGruder is very withdrawn and unmotivated because of his learning disability and that while he is capable of caring for his personal hygiene and performing housework, McGruder must be regularly prompted and specifically shown the steps to be taken. (R. 172.) Greene testified that McGruder is illiterate and not even capable of accurately taking down a phone message. (R. 173.) Greene said that McGruder frequently loses things, such as his identification and Social Security cards, and he does not have keys to her apartment because he consistently loses them. (R. 179.)

Greene described an incident in which McGruder had such a conflict with a nurse at Cook County Hospital that the nurse refused to further treat him. (R. 176-78.) Greene opined that McGruder was not capable of holding a job such as sweeping at McDonald's because he cannot read, which precludes him from riding public transportation or reading labels on cleaning chemicals; he could not fill out an application; and he needs constant guidance to perform simple tasks. (R. 183.) Greene added that McGruder was susceptible to being taken advantage of by people. (R. 176.)

### 3. *Medical Evidence*

#### a. DDS Consultant Evaluations

The record contains three relevant medical evaluations: (1) a December 3, 2001 cognitive evaluation performed by Dr. William Burwell, (R. 148-51); (2) a March 22, 2004 psychiatric evaluation by Dr. Mahim Vora, (R. 122-24); and (3) a functional capacity assessment by Dr. Glen Pittman, which was completed on April 13, 2004, (R. 125-42). Dr. Burwell diagnosed McGruder with Borderline Intellectual Functioning, with a verbal IQ score of 74,

performance IQ score of 74, and a full scale IQ score of 71. (R. 149-50.) Dr. Vora diagnosed McGruder with major depression, not otherwise specified, and rule out learning disability. (R. 124.) Dr. Pittman indicated that McGruder was impaired due to a learning disability as well as depression not otherwise specified. (R. 126, 128.) Dr. Pittman's report includes two different evaluations, the names of which are obscured in the record copies. In his testimony, the medical expert referred to the two evaluations as an "RFC" and a "PRTF." (R. 192.) In the PRTF, Dr. Pittman concluded that McGruder's impairments resulted in moderate functional limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (R. 135.) In the RFC, Dr. Pittman concluded that McGruder was moderately limited in the ability to understand, remember, and carry out detailed instructions but was not otherwise significantly limited. (R. 139-40.)

**b.      Medical Expert's Testimony**

Dr. Joseph Cools testified as the medical expert ("ME") at the hearing. (R. 184.) The ME first opined that the depression diagnosed by Dr. Vora was not severe enough to meet or equal any listing. (R. 186.) He testified that despite the diagnosis, there was no longitudinal record, the claimant had not been in treatment or taking medication, and that the only vegetative symptom to approach any kind of severity was a sleep disturbance. (R. 185-86.)

Next, the ME discussed McGruder's limitations due to his borderline intellectual functioning. The ME testified that a score of McGruder's level is not far above a mild mental retardation range; consequently, it would be expected that his cognitive deficits would interfere with functioning. (R. 186.) The ME added that McGruder would not be able to understand, learn, or carry out detailed instructions – anything over four steps – but that he should be able to concentrate. (R. 186-87.) The ME noted that McGruder's medical records lacked specific

information about the probability of his being distracted by external stimuli but concluded that concentration is not a particular problem for McGruder. (R. 197.)

The ME acknowledged the possibility that McGruder's true IQ scores fall within the mental retardation range, explaining that pursuant to the standard area of measurement, it was 90% certain that McGruder's full-scale score would fall between 67 and 75. (R. 189.) The ME nevertheless concluded that McGruder did not meet a listing for the purposes of SSIB because he lacked an additional impairment. (R. 190.) The ME stated that McGruder's illiteracy was subsumed within his IQ score and thus was not considered an additional impairment. (R. 190.) The ME also testified that he did not see any evidence of a dependent personality disorder, which is defined by a definitive psychological diagnosis, not by the fact that a person has been dependent upon others for some of his needs. (R. 192.)

### 4. *Vocational Expert's Testimony*

Glee Kehr testified as the vocational expert ("VE"). (R. 26.) She testified that McGruder has never worked. (R. 194.) The ALJ asked the VE if there was any other work in the region that McGruder could perform. (R. 194.) The VE testified that jobs exist for a 43-year-old illiterate individual who can only perform one- to three-step tasks in the manufacturing sector; specifically in the tri-metro area, in the light to medium category, there were approximately 10,000 packaging jobs and 6500 assembly jobs. (R. 195.) The ALJ then asked if the availability of jobs would change if an individual needed to be reminded to stay on task at least once an hour. (R. 195.) The VE explained that the manufacturing sector requires a person to be on task 90% of the time, and that a requirement of an hourly reminder would likely preclude the individual from doing the job. (R. 195.)

The ALJ then asked if jobs such as sweeping were available in substantial numbers. (R.

6

196.) The VE testified that sweeping jobs generally fall within the categories of housekeeping or janitorial, positions that require an individual to work more independently, with steps in excess of three. (R. 196.)

After learning about the issues that McGruder had with interacting people, the VE testified that manufacturing jobs typically do not require the worker to interact with people; consequently, his inability to interact with people did not affect the availability of jobs. (R. 204.) McGruder's attorney then asked the VE the extent to which a worker would be required to follow rules and instructions from a supervisor. (R. 205.) The ALJ told the VE not to answer the question, stating that employability posits some basic ability to follow rules, and she was not aware of any objective evidence to suggest that McGruder could not do so. (*Id.*)

## C. **ALJ Decision**

The ALJ found that McGruder had not engaged in substantial gainful activity at any relevant time. (R. 24.) The ALJ also found that McGruder had severe impairments from borderline intellectual functioning and a history of learning disabilities. (*Id.*) However, the ALJ found that these conditions did not meet or medically equal any listing of impairments. (R. 25.)

The ALJ next found that McGruder had the following mental residual functional capacity ("RFC"): to understand, remember, and carry out unskilled tasks; to maintain attention and concentration for sufficient periods of time in order to perform unskilled tasks; interact appropriately with the general public, supervisors, and co-workers on an occasional basis; to respond appropriately to changes in the work setting; and with the need to receive verbal instruction and to be shown how to do tasks. (R. 27-28.) The ALJ found that while McGruder undoubtedly experienced some limitations from his impairments, the extent and frequency reported was not fully credible, citing the lack of "any objective evidence in the record that

supports the claimant's argument that he [was] not able to stay on task 90% of the time." (R. 28.) The ALJ concluded that McGruder had the following physical RFC: occasional lifting up to fifty pounds at a time; frequently lifting or carrying objects weighing up to twenty-five pounds; and standing or walking, off and on, for at least six hours in an eight-hour workday. (*Id.*)

The ALJ found that McGruder had not performed any past relevant work. (R. 29.) The ALJ further concluded, based on the testimony of the VE, that when considering his age, limited education, ability to communicate in English, and RFC including his mental limitations, that McGruder could perform certain occupations of unskilled medium work, and that there were jobs in significant numbers in the national economy that McGruder could perform, such as sorter, packager, and assembler. (R. 29-30.) Consequently, the ALJ ruled that McGruder was not disabled under the Social Security Act. (R. 30.)

## III.  DISCUSSION

### A.  ALJ Legal Standard

Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42. U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order:  (1) Is the claimant presently unemployed?  (2) Does the claimant have a severe impairment?  (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations?  (4) Is the claimant unable to perform his former

occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. §
416.920(a)(4) (2008).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is
disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A
negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The
claimant bears the burden of proof at steps 1-4. *Id.* Once the claimant shows an inability to
perform past work, the burden then shifts to the Commissioner to show the ability to engage in
other work existing in significant numbers in the national economy. *Id.*

**B.    Judicial Review**

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of
Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42
U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the
ALJ's findings are support by substantial evidence or based upon legal error. *Clifford v. Apfel,*
227 F.3d. 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997).
Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to
support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478
F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the
Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or
deciding questions of credibility. *Skinner*, 478 F.3d at 841.

The ALJ is not required to address "every piece of evidence or testimony in the record,
[but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to
deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ
denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to

his conclusion." *Clifford*, 227 F.3d at 872. The ALJ "must at least minimally articulate the analysis for the evidence with enough detail and clarity to permit meaningful appellate review." *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Murphy v. Astrue*, 498 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions, and must adequately articulate his analysis so that we can follow his reasoning.").

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

**C.     Analysis**

McGruder argues that the ALJ erred (1) at Step 3, where she concluded that his impairments did not meet or equal Listing 12.05(C); and alternatively (2) at Step 5, where she found that there were significant jobs in the economy that he could perform.

*1.     Step 3 - Listing 12.05*

Listing 12.05 provides that the following criteria must be established for a finding of mental retardation:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

> A.     Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; Or

B. A valid verbal, performance, or full scale IQ of 59 or less; Or

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; Or

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.[5]

"[I]n order to meet all the requirements of Listing 12.05(C), a claimant must satisfy a three-part test: (1) the claimant must have a valid verbal, performance, or full scale IQ of 60 through 70, (2) the claimant must demonstrate physical or mental impairments imposing additional and significant work-related limitations of function, and (3) the claimant must meet the diagnostic description of mental retardation set out in the capsule."[6] *Witt v. Barnhart*, 446 F. Supp. 2d 886, 893-94 (N.D. Ill. 2006).

---

[5] The ALJ referred to Listing 12.05(A), (B), and (C) collectively as "the 'A' criteria" and Listing 12.05(D) as "the 'B' criteria." (R. 25-26.) It appears possible that the ALJ has confused Listing 12.05 with other section 12.00 mental disorder listings, which define a disorder through both "paragraph A criteria" and "paragraph B criteria" (or, in some instances, "paragraph C criteria"). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A) ("Each listing, except 12.05 and 12.09, consists of a statement describing the disorder(s) addressed by the listing, paragraph A criteria (a set of medical findings), and paragraph B criteria (a set of impairment-related functional limitations). . . . We will find that you have a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied."). In this case, the ALJ did not find that McGruder met either set of criteria, so this potential confusion was not critical to her ultimate finding of non-disability. But on remand, the ALJ is cautioned that Listing 12.05 requires McGruder to prove he meets the criteria in either subsection (C) *or* (D), not both.

[6] The Commissioner argues that McGruder did not meet the diagnostic criteria for mental retardation as stated in the capsule. The ALJ did not make any finding as to this element of Listing 12.05(C), which should be addressed on remand.

McGruder first argues that, while his verbal and performance IQ scores were 74 and his full scale score was 71, the ALJ should have found that he had a valid IQ of 60 through 70 based upon the test's five-point standard of error. While it is not entirely clear in the opinion, the ALJ did appear to assume that McGruder had a valid IQ score of 60 through 70 in her analysis of Listing 12.05(C). She cited the ME's testimony in which he opined that, based on the standard error of measurement, a score of 71 was not an exact figure, there was a 90% certainty that a score of 71 would fall between 67 and 75, and there is a possibility that McGruder's true scores may fall between 60 and 70. (R. 25); *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(c) ("In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05.").

McGruder next argues that his illiteracy, learning disability, and dependent personality disorder should have been considered additional impairments for the purposes of Listing 12.05(C). The ALJ found that McGruder did not meet Listing 12.05(C) because he did not suffer from an additional mental or physical impairment, agreeing with the ME's assertion that McGruder's learning disability and functional illiteracy were reflected in his IQ score and thus do not constitute "additional" impairments. She also concluded, based upon the ME's testimony, that McGruder "did not possess the traits that warrant a diagnosis of dependent personality disorder." (R. 25.)

But in the context of her Step 2 analysis, the ALJ expressly found that McGruder's "medically determinable impairments" of "borderline intellectual functioning and a history of learning disability . . . cause significant limitations in the claimant's work related functioning and are, therefore, severe within the meaning of the Regulations (20 C.F.R. 416.920(c))." (R.

24.) The ALJ's opinion does not explain why she considered these impairments to be severe at Step 2, but not at Step 3 in relation to Listing 12.05(C).[7] *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A) ("For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, *i.e.*, is a 'severe' impairment(s), as defined in §§ 404.1520(c) and *416.920(c)*.") (emphasis added); *see also McPheron v. Barnhart*, No. 02 C 6261, 2003 WL 22956395, at *14 (N.D. Ill. Dec. 12, 2003) (stating that while a finding of "severe" impairment may be directed at Step 2, "that does not mean the finding is irrelevant to Step 3"); *Elster v. Barnhart,* No. 01 C 4085, 2003 WL 124432, at *5 (N.D. Ill. Jan. 13, 2003) (holding that an ALJ's Step 2 finding that a claimant had severe mental impairments including borderline intelligence and a learning disability satisfied the second requirement of Listing 12.05(C)).

The Court also concludes that the ALJ did not adequately examine the evidence of McGruder's functional limitations as they relate to the Listing 12.05(D) criteria. The relevant portion of the Code of Federal Regulations provides that:

> **1. Activities of daily living** include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.
> . . . .
>
> **2. Social functioning** refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members,

---

[7] The Court also notes that during the hearing, the ALJ stated that she would research whether illiteracy constitutes an additional mental impairment under Listing 12.05(C), (R. 190, 210), but the opinion does not indicate whether she did any additional research or what she may have uncovered.

friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.

. . . .

**3. Concentration, persistence, or pace** refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings.

. . . .

We must exercise great care in reaching conclusions about your ability or inability to complete tasks under the stresses of employment during a normal workday or work week based on a time-limited mental status examination or psychological testing by a clinician, or based on your ability to complete tasks in other settings that are less demanding, highly structured, or more supportive. We must assess your ability to complete tasks by evaluating all the evidence, with an emphasis on how independently, appropriately, and effectively you are able to complete tasks on a sustained basis.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(1)-(3).

The ALJ determined that "the medical evidence of record does not support a finding that the claimant experiences any marked functional limitations in his activities of daily living; social functioning; and/or concentration, persistence, or pace" and that there is also no evidence of decompensation or deterioration of extended duration. (R. 26.) The ALJ agreed with the ME's testimony that, with his "mild" to "moderate" limitations, McGruder "can perform simple, routine unskilled tasks after being shown how, and can respond appropriately to changes in the work setting after being given appropriate new instructions. Moreover, he can interact and

14

respond appropriately to peers, co-workers, supervisors, and the general public on an occasional basis." (R. 28.)

The ALJ found that none of the DDS reviewers or medical experts concluded that McGruder suffered from "marked" limitations. She stated that a January 2, 2002 DDS report concluded that McGruder had "mild" restrictions in his activities of daily living, "mild" difficulties in maintaining social functioning, "moderate" difficulty with concentration, persistence, and pace, and no episodes of decompensation; Dr. Pittman's April 13, 2004 report found "moderate" restrictions in the first three categories and found no decompensation; and that Dr. Vora's March 22, 2004 report "found greater limitations than were found on January 2, 2002 in the claimant's activities of daily living and in maintaining social functioning." (R. 26.) The ALJ stated that she gave less weight to the April 13, 2004 report because it was based upon a one-time consultative exam, and because the ME testified at the hearing that, based upon his review of the record, McGruder had only those limitations described in the 2002 report. (*Id.*, *see also* R. 27 ("After reviewing the entire record, I give the greatest weight to the January 2, 2002 DDS reviewers and to the testimony of the Medical Expert, since I find those opinions to be the most consistent with and supported by the entire record, including the testimony at the hearing.").)

The ALJ noted that McGruder was able to sweep a floor while he was in prison and that "he helps with some tasks around the house," such as raking, cleaning, doing laundry, and taking out trash. (R. 28.) She found no evidence supporting McGruder's argument that he is not able to stay on task 90% of the time, instead crediting the ME's testimony that there was no evidence in the record showing that McGruder is distracted by external stimuli. (*Id.*)

The Court finds that the ALJ did not build a logical bridge between the evidence and her conclusions related to McGruder's functional limitations for several reasons. First, the only report in the record discussing functional limitations is Dr. Pittman's April 13, 2004 report, and it is not clear what the ALJ was referring to when she recited the limitations contained in the other two reports. Indeed, the administrative record contains no January 2, 2002 report, which the ALJ cites as "F Exhibit in former application file." (R. 26.)

Second, the ALJ overstated the ME's testimony when she determined that "the Medical Expert testified, based on his review of the entire record, that the claimant had only the limitations found by the January 2, 2002 DDS reviewers." (R. 26.) The ME opined that the RFC section of Dr. Pittman's report is more relevant than the PRTF section in the employment context,[8] but he did not explain the distinction between the PRTF and the RFC; he did not state that McGruder "had only the limitations" found in the January 2, 2002 report; he never adopted the functional limitations of any of the reports; and in fact, he never discussed a January 2, 2002 report at all. To the contrary, the ME testified that "there's basically just two bits, two pieces of medical information," *i.e.*, the reports of Drs. Burwell and Vora. (R. 185); *see Scott v. Barnhart*, 297 F.3d 589, 596 (7th Cir. 2002) (stating that the reviewing court could not "engage in the meaningful, albeit deferential, review that the statute mandates" when the ALJ failed to meaningfully discuss medical opinions and resolving any conflicts among diagnoses).

Third, the ALJ did not adequately analyze the evidence of functional limitations that was properly in the record. Both the PRTF and RFC sections of Dr. Pittman's report considered McGruder's functional limitations under Listings 12.02 (Organic Mental Disorders), *i.e.*, his

---

[8] The ME testified that the PRTF and the RFC "capture two different bits of information, so what we're talking about I think in this instance in work-related terms is confined to the mental RFC." (R. 197.)

diagnosed learning disability, and 12.04 (Affective Disorders), *i.e.*, his depression not otherwise specified. (R. 135, 139), but it made no finding of functional limitations under Listing 12.05.[9] The ALJ recognized that McGruder's impairments were analyzed under Listings 12.02 and 12.04 rather than 12.05 but concluded that "multiple reviewers have evaluated the claimant's mental limitations under multiple possible approaches but no reviewer has found that the claimant meets the requirements of any listed mental impairment." (R. 26.) On remand, the ALJ must more fully develop her finding that the failure to identify impairments under Listings 12.02 and 12.04 leads to the conclusion that McGruder is not impaired under Listing 12.05. *See Murphy v. Astrue*, 496 F.3d 630, 635 (7th Cir. 2007) (holding that while the regulations did not require the ALJ to contact an expert a second time to explain an inconsistency, it "would have been the best way for the ALJ to complete the administrative record and adequately support his decision").

Finally, the ALJ either did not consider the testimonial evidence supporting McGruder's claimed limitations or did not articulate why this evidence was not considered. The ALJ did not explain why McGruder's ability to perform some household tasks equates to the ability to perform effectively in a competitive workplace. As the Seventh Circuit has held:

> We have cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home. . . . The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work.

---

[9] While the Court is certainly not trained as a forensic document expert, it appears that Dr. Pittman initially checked relevant boxes and made diagnoses under Listing 12.05, but those entries were redacted from the final report. (*See, e.g.*, R. 129, 135, 139.) The reasons for this apparent amendment is not part of the record.

*Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006); *see also Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008) ("'[T]he skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job.'") (quoting SSR 85-15).

Moreover, the ALJ summarily concluded that none of his impairments was "marked" for purposes of the Listing 12.05(D) analysis, based upon the evaluations' descriptions of his impairments as "mild" or "moderate," without viewing his impairments in the context of the entire record. With regard to activities of daily living, the regulations provide that:

> We do not define "marked" by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function. For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(1).

The sections regarding social functioning and concentration, persistence, or pace contain similar passages:

> We do not define "marked" by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function. For example, if you are highly antagonistic, uncooperative, or hostile but are tolerated by local storekeepers, we may nevertheless find that you have a marked limitation in social functioning because that behavior is not acceptable in other social contexts.
> . . . .
> We do not define "marked" by a specific number of tasks that you are unable to complete, but by the nature and overall degree of interference with function. You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks. Deficiencies that are apparent only in performing complex procedures or tasks would not satisfy the intent of this paragraph B criterion. However, if you can complete many simple tasks, we may

nevertheless find that you have a marked limitation in concentration, persistence, or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(2)-(3).

Testimony was presented that could support a conclusion that his limitations were "marked," *e.g.*, that he required constant and direct supervision and could not perform routine tasks consistently. *See McPheron*, 2003 WL 22956395, at *16 (criticizing an ALJ for failing to expressly accept or reject unrebutted testimony supporting a "marked restriction" in "activities of daily living," namely that the claimant would not bathe daily without being reminded). By finding "no evidence" supporting his claim that he cannot stay on task 90% of the time, the ALJ implicitly rejected the testimony of both McGruder and his sister, which suggested that he could not perform tasks with multiple steps, or independently perform even routine tasks, such as bathing, cleaning, and taking down a phone message. The ALJ is of course not required to credit this testimony, but she must describe the reasons why she rejected it. Similarly, the fact that there is no evidence that McGruder becomes distracted by external stimuli does not, without more, establish that he is able to stay on task even in the absence external distraction. An ALJ is required to build a logical bridge from the facts to her conclusions, and she has not done so here.

The ALJ also opined that McGruder is not in fact completely illiterate and that his testimony established that he is "sufficiently litera[te] to recognize and read signs and box labels," (R. 28), but she did not explain why the ability to recognize certain signs and labels was equivalent to "sufficient literacy" in the context of his daily activities and social functioning. In addition, at the hearing, the ALJ repeatedly stated that McGruder is "illiterate," (R. 194-95), which is not consistent with her ultimate conclusion. As explained above, an ALJ must not cite

19

only evidence in support of her conclusion but must also explain why contrary evidence was not considered or was found to carry less weight. *See Herron*, 19 F.3d at 333.

## 2. *Step 5 - Residual Functional Capacity*

McGruder argues that the ALJ's RFC determination at Step 5 was flawed because it: (1) did not accord enough weight to the testimony of McGruder's sister and made an improper credibility determination; and (2) considered evidence outside the record.

The RFC is a measurement showing what an individual is capable of despite his limitations in order to determine what type of work the claimant would be able to complete. 20 C.F.R. § 404.1520(a)(4); SSR 96-8P. The RFC is based on all the relevant evidence in the record, including all allegations of physical and mental limitations. 20 C.F.R. § 404.1545(a); SSR 96-8P. Furthermore, there must be an explanation tying the medical and nonmedical evidence to each conclusion. SSR 96-8P. The ALJ's finding of the claimant's RFC must be supported by substantial evidence in the record, and the ALJ must articulate why he rejected significant conflicting evidence. *Clifford*, 877 F.3d at 873-74.

The ALJ found that McGruder had the following mental RFC: to understand, remember, and carry out unskilled tasks; to maintain attention and concentration for sufficient periods of time in order to perform unskilled tasks; interact appropriately with the general public, supervisors, and co-workers on an occasional basis; respond appropriately to changes in the work setting; and needs to receive verbal instruction and be shown how to perform tasks. (R. 27-28.) The ALJ concluded that McGruder could perform unskilled medium work and that there were significant numbers of such jobs in the regional economy, which led to the ALJ's finding that McGruder was "not disabled" at Step 5 in the evaluation process. (R. 27-29.)

20

The ALJ based her RFC finding on the medical evidence and opinion evidence in the record as well as her conclusion that McGruder's testimony regarding the intensity, duration, and limiting effects of his symptoms was not entirely credible. (R. 28.) The ALJ also stated that she found the opinions of the medical expert to be the most informed, convincing, and consistent with the medical evidence and the record as a whole. (R. 29.)

McGruder first argues that the ALJ should have given more weight to Greene's testimony because of her close familiarity with McGruder's condition and because of her practical training as a nurse. The Commissioner responds that Greene testified at the hearing as Plaintiff's sister, not a treating medical care provider. In her opinion, the ALJ briefly mentioned some of Greene's testimony but did not state whether she gave more or less weight to Greene's testimony or whether she found Greene to be credible. (R. 26-27.)

20 C.F.R § 416.913(a)(1)-(5) identifies acceptable medical sources as licensed physicians, psychologists, optometrists, podiatrists, and speech language pathologists. *Id.* However, SSR 83-20 states that where "additional relevant medical evidence is not available, it may be necessary to explore other sources of documentation (such as through family members or friends) to furnish additional evidence regarding the course of an individual's condition." *Id.*; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(1)(c) ("If necessary, information should also be obtained from nonmedical sources, such as family members and others who know you, to supplement the record of your functioning in order to establish the consistency of the medical evidence and longitudinality of impairment severity . . ."). As McGruder's sister, Greene was thus an appropriate source, and because her testimony supported McGruder's claims of impairment, the ALJ should have stated why the testimony was not credited or given little weight. *See Corder v. Massanari*, No. 00 C 2714, 2001 WL 1355986, at *4 (N.D. Ill. Nov. 1,

2001) (citing case in which the government was not reasonable in "fail[ing] to make credibility findings when discounting the testimony of plaintiff's mother") (citation omitted).

The ALJ also did not adequately articulate the reasons she found McGruder's testimony not to be credible. An ALJ's credibility determination is granted substantial deference by a reviewing court unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, an ALJ must give specific reasons for discrediting a claimant's testimony, and "[t]hose reasons must be supported by record evidence and must be 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Lopez* ex rel. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (quoting *Zurawski*, 245 F.3d at 887-88).

The ALJ concluded that McGruder's "statements concerning the intensity, duration and limiting effects of [his] symptoms are not entirely credible," (R. 26, 28), because they were not supported by the objective medical evidence in the record. *See Craft*, 539 F.3d at 678 ("Where the credibility determination is based upon objective factors rather than subjective considerations, we have greater freedom to review the ALJ's decision."). But the lack of objective evidence supporting the severity of his limitations is not by itself reason to find a claimant's testimony to be incredible. *See Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005) (holding that an ALJ is "preclude[d] . . . from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding"). In this case, the ALJ pointed to no evidence directly contradicting McGruder's claimed limitations, and indeed, those limitations were supported by his sister's testimony. The ALJ provided no reasoning by which this Court could determine the

validity of her credibility determination. This credibility finding was critical, because had she credited the testimony supporting McGruder's claim that he could not stay on task 90% of the time, he would have been found disabled pursuant to the VE's testimony.

Finally, McGruder argues that the ALJ improperly considered evidence outside the record, namely her personal experiences. In relevant part, the ALJ stated:

> And I'll tell you my thinking about this just so we're on the same page. Mentally retarded people can hold jobs. They need a little more structure, they need somebody to reminder [sic] to get them up every morning and appropriately cleaned and dressed and to get them there, but once they're there, you know, if the environment is structured and they have a little lunch pail they should be able to get there and, you know, they can be taught to get to someplace, either they can be dropped off, I've seen them on the bus, you know.

(R. 199.)

Although the ALJ did not refer to these statements in her decision, they indicate the possibility that she may have relied on her own experience in determining McGruder's RFC, which would have been improper. *See Nelson v. Apfel*, 131 F.3d 1228, 1236-37 (7th Cir. 1997). The statements are also suggestive of possible bias on the ALJ's part. *See Pearce v. Sullivan*, 871 F.2d 61, 63 (7th Cir. 1989) (defining bias as "prejudgment based on information obtained outside the courtroom, rather than to rulings, even if hasty or errant, formed on the basis of record evidence and other admissible materials and considerations").

The government responds that the ALJ's comments were merely intended to illustrate the reasons why an additional limitation is required in finding a mentally retarded person to be disabled. That may be true, given the context in which the statements were made, but it is also possible that the ALJ considered evidence outside the record. The statements also suggest that the ALJ considered the existence of structured, rather than competitive, work to be relevant to

the RFC determination. Without further explanation, the Court cannot determine what role, if any, the ALJ's personal experiences played in her decision.

The Court concludes that outright reversal of the ALJ's decision is not appropriate, because there is evidence in the record that could support a finding of non-disability. *See McPheron*, 2003 WL 22956395, at *17. However, a remand is necessary to allow the ALJ to more fully develop the factual record and illustrate the logical bridge between the evidence and her conclusions.[10] *See id.*

## CONCLUSION

For the foregoing reasons, McGruder's motion for summary judgment [Doc. No. 18] is granted in part and denied in part, and the Commissioner's motion for summary judgment [Doc. No. 21] is denied. The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this opinion.

**SO ORDERED.**

**ENTERED:**

*Maria Valdez*

**DATE:** August 13, 2009

**HON. MARIA VALDEZ**
**United States Magistrate Judge**

---

[10] If, on remand, the ALJ finds McGruder not to be disabled at Step 3 and therefore continues on to the Step 5 analysis, she is cautioned not to incorporate the Listing 12.05(D) disability standards into her RFC determination, "which would be legal error." *McPheron*, 2003 WL 22956395, at *17 n.5.